**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

ROGER MATHEWS,

                Plaintiff,

v.                                   Case No. 17-1175-EFM

BUTLER COMMUNITY COLLEGE,

                Defendant.

## <u>PRETRIAL ORDER</u>

A pretrial conference was conducted in this case on January 4, 2019, by U.S. Magistrate Judge K. Gary Sebelius.  The plaintiff, Roger Mathews, appeared through counsel, Terry L. Mann of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P. The defendant, Butler Community College, appeared through counsel, Edward L. Keeley of McDonald Tinker, P.A.

This pretrial order supersedes all pleadings and controls the subsequent course of this case.  It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice.  Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(b).

1)   **PRELIMINARY MATTERS.**

a)   **Subject-Matter Jurisdiction.**  Subject matter jurisdiction is invoked under 28 U.S.C. § 1331 and § 1367, and 29 U.S.C. § 621 *et seq.* and is not disputed.

b)   **Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

c)   **Venue.**  The parties stipulate that venue properly rests with this court.

d)   **Governing Law.**  Plaintiff brings claims for discrimination and disparate treatment under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* and the Kansas Age Discrimination in Employment Act ("KADEA"), K.S.A. § 44-1111 *et seq.*  Plaintiff also brings a claim for retaliation under the ADEA and KADEA.  Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the following law: The statute, regulations, and case law interpreting and applying the ADEA and KADEA.

2)   **STIPULATIONS.**

a)   The following facts are stipulated:

1.   At all times material hereto, defendant has been an "employer" as defined by the ADEA and KADEA.

2.   Plaintiff was born in October of 1951.

3.   At all times material hereto, plaintiff was employed by defendant as an instructor in the Fine Arts and Communication

2

Department. Plaintiff taught a variety of art-related courses, including jewelry design, stained glass design, and ceramics.

**Other Stipulations**

1.   Legible copies of original documents may be offered and admitted into evidence without further objection on the basis of the so-called "best evidence" rule.

2.   At trial, witnesses who are within the subpoena power of the Court and who are officers, agents, or employees of the parties need not be formally subpoenaed to testify, provided that opposing counsel is given at least 14 days advance notice of the desired date of trial testimony.

3.   By no later than 1:30 p.m. each day of trial, plaintiff and counsel shall confer and exchange a good faith list of the witnesses who are expected to testify the next day of trial.

**b)**   The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment and trial:

1.   Defendant's Personnel File on Plaintiff

2.   Defendant's Payroll Records on Plaintiff

3.   Defendant's Benefit Information

4.   Defendant's Policies and Procedures

5.   Defendant's Organizational Charts

6.   Plaintiff's Income Tax Returns Produced in Discovery

3

7.    E-mails Produced by Defendant in Discovery

8.    Audio Recordings Made by Plaintiff

9.    Chief Bryan's Investigative File re Plaintiff

10.   Fire Marshal Notices and Information Produced by Defendant

11.   Board of Trustees Information Produced by Defendant

## 3)   FACTUAL CONTENTIONS.

### a)   Contentions of Plaintiff.

Plaintiff contends that he was discriminated against due to his age, and that he was unlawfully retaliated against for participation in protected activity.  At all times material hereto, plaintiff was a member of the protected age group.

Plaintiff was hired by defendant as a part-time instructor in August of 1980. He was hired as a full-time employee on August 1, 1986, and continued his employment with defendant until December, 2015.  Plaintiff performed his assigned duties in a satisfactory manner. He was not disciplined by defendant prior to August 14, 2015, and received favorable performance evaluations and student evaluations. The equipment used for plaintiff's art classes included a number of kilns, torches, and other items. Throughout his employment at The Butler Community College, plaintiff also created his own jewelry, ceramics, and other items that were used offered for sale in his Wichita art gallery.  Jay Moorman, the Dean over plaintiff's department, was aware that plaintiff used college-owned equipment and electricity for items which plaintiff sold for himself, and never made any objection.

4

Early in the morning on April 24, 2015, there was a fire in the Art Lab area, which included combustible materials placed on top of a seldom-used kiln. Plaintiff was not present at the time the fire started, nor were any students. The fire was detected and extinguished by a member of the campus security group, and caused only minimal damage.

The morning of the fire, defendant's Chief of Police Tim Bryan informed plaintiff that the area where the fire had occurred was a "crime scene," and that plaintiff was a "suspect."  Plaintiff was instructed to leave the campus by an officer.

Plaintiff was instructed to clean up his area after the fire, and did so to Dean Jay Moorman's satisfaction.  On May 26, 2015, Dean Jay Moorman asked plaintiff if he was going to retire.  Plaintiff declined to answer the question.

On or about June 15, 2015, plaintiff met with Dean Jay Moorman and Vice President of Academics Karla Fisher from defendant's administration. They stated that the administration had consulted with their employment counsel, and plaintiff was not going to be disciplined by the college for anything related to the fire. Karla Fisher also said, however, that the college's Chief of Police, Tim Bryan, still could press criminal charges against plaintiff, and would do so if plaintiff did not retire or if defendant did not terminate him.

The next day, plaintiff met with defendant's Police Chief, Tim Bryan.  During that meeting, Chief of Police Bryan stated that he had been investigating the fire, and believed that he had the evidence necessary to prove three separate criminal offenses. First, he stated that he would ask the District Attorney of Butler County

to bring felony theft charges against plaintiff for the use of school property and electricity, that being the occasional use of kilns, torches, and other school equipment. Chief Bryan estimated the amount of that alleged theft as being in excess of $100,000, and possibly as much as $1.9 million. Second, he stated that he would ask the Butler County District Attorney to bring misdemeanor charges against plaintiff for maintaining a public nuisance, that being having combustibles stored near the kiln. Third, he stated that he would seek to have plaintiff charged with felony interference with law enforcement, for speaking to one student by telephone following the fire. Mr. Bryan noted that he had checked plaintiff's criminal record, and found that plaintiff had only received one traffic ticket. He gave plaintiff copies of the Kansas criminal statutes which plaintiff was alleged to have violated, and a Sentencing Grid which showed the sentence ranges for the alleged crimes. These statements by Police Chief Bryan were frightening and intimidating to plaintiff.

Chief Bryan stated that he had suspended his investigation, while waiting to see if some "alternative solution" could be reached. He implied that, if plaintiff retired, he might not pursue the criminal charges. He stated that, if this "alternative solution" was not reached, he would have two years to decide whether to pursue misdemeanor criminal charges against plaintiff, and five years for the felony charges. He stated that the prosecution would be embarrassing for plaintiff and his family, and would necessitate testimony by current and former students and co-

workers, causing further embarrassment to plaintiff. Chief Bryan told plaintiff that he has a "very high conviction rate."

Plaintiff's attorney complained to the college's attorney, Robert Overman, that plaintiff was in the protected age group, and should not be compelled to retire under threat of criminal prosecution by his employer. Plaintiff refused to retire.

On June 23, 2015, plaintiff was informed by a phone call from Vicki Long that the administration had determined that they would recommend to the Board of Trustees that plaintiff's employment should be terminated. This was followed up by a letter dated June 27, 2015, stating the same conclusion.

The recommendation for termination indicated that there had been previous notations by the Fire Marshal of infractions in plaintiff's work area. The most recent of these had been in May of 2009 -- more than six years earlier.  The oldest Fire Marshal notice that formed a basis for the discipline was from 2002 – more than thirteen years earlier.  It is defendant's normal practice to impose discipline on an employee close to the time the infraction is committed. Defendant also has a progressive discipline policy, which recommends verbal warnings, written warnings, and unpaid suspensions prior to a termination.  Plaintiff was not given any prior discipline for the Fire Marshal notices.

The termination recommendation was made to the Board of Trustees. The Board met in special session first on July 14, but could not reach a decision. The Board met again on July 27, 2015, and rejected the administration's request for plaintiff's termination.   Plaintiff contends that the request for termination was made

because of plaintiff's age, his refusal to retire, and in retaliation for plaintiff's participation in protected activity.  Younger instructors' departments had received Fire Marshal notices, and were not subject to any discipline.  Instructors who had not complained about their treatment had not been retaliated against.

After the administration was informed that the Board of Trustees would not authorize plaintiff's termination, plaintiff was given a Corrective Action Notice on August 14, 2015. The Corrective Action Notice reiterated that there had been previous notations by the Fire Marshal of infractions in plaintiff's work area, the last of which occurred in May of 2009 -- more than six years earlier.

The Corrective Action Notice was specifically a "zero tolerance" warning, and plaintiff was cautioned that any violation would result in the administration making another attempt to have the Board of Trustees approve his termination. Included within the warning were requirements that plaintiff could be further disciplined if a student were to bring any food or drink into his work area.

Plaintiff's work area was subject to weekly review by Dean Moorman.  In addition, plaintiff had a daily check sheet that he was required to complete and leave for Dean Moorman.  After plaintiff received the Corrective Action Notice on August 14, 2015, there was never any violation by plaintiff.

Other employees had received multiple Fire Marshal notices, but none had been disciplined for having received such writeups.  The Corrective Action Notice was implemented, even though plaintiff had been previously told that there was not adequate basis for discipline due to the fire.  Plaintiff contends that he was

disciplined years after the alleged basis for the discipline, because of his age, his refusal to retire, and in retaliation for his participation in protected activity. Younger instructors who had received Fire Marshal writeups and who had not complained about discriminatory treatment were not subject to zero tolerance Corrective Action Notices based on Fire Marshal notices that were between six and thirteen years old.

On or about October 24, 2015, plaintiff filed an administrative complaint with the Kansas Human Rights Commission and Equal Employment Opportunity Commission, alleging age discrimination and retaliation for plaintiff's having participated in protected activity.

Plaintiff fully complied with the Corrective Action Notice, but was informed that the Maintenance Department could not perform maintenance on the kilns in his area, on instructions from Chief Bryan. Chief Bryan had no authority over the Maintenance Department. Instructors who were younger and who had not complained about their discriminatory treatment were not denied maintenance services. The refusal to provide ordinary maintenance was due to plaintiff's age, his refusal to retire, and in retaliation for his participation in protected activity.

In mid-December, plaintiff was informed that he would be required to teach an Art Appreciation class beginning in January. Plaintiff had never taught a lecture class, and significant preparation would be necessary in order for him to do so effectively. Plaintiff believed that he was being put into a position to fail, due to his age, his refusal to retire, and his participation in protected activity. On December

9

17, 2015, plaintiff submitted a letter of resignation, stating that he believed he had been constructively discharged.

Plaintiff was sixty-four years of age when his employment with defendant ended.  Plaintiff was replaced by Tricia Coates, who is in her mid-thirties.

On or about May 28, 2016, plaintiff filed an amended administrative complaint with the Kansas Human Rights Commission and Equal Employment Opportunity Commission, alleging age discrimination and retaliation for plaintiff's having participated in protected activity.  On or about April 26, 2017, the Equal Employment Opportunity Commission mailed plaintiff its Dismissal and Notice of Rights.  Plaintiff filed his lawsuit within ninety days of receipt of the Notice of Right to Sue.

No criminal charges were ever brought against plaintiff.

**b)** **Contentions of Defendant.**

Defendant, Butler Community College (BCC), denies all of plaintiff's claims of age discrimination and retaliation.  On August 14, 2015, Mathews was given an employee corrective action notice and reprimand at the direction of the of the BCC Board of Trustees.  That corrective action notice and reprimand had nothing to do with Mathews' age and was not retaliation for any protected activity.  That employment action had everything to do with Mathews' gross carelessness in allowing one of his ceramic kilns to start a fire on April 24, 2015, in his art classroom/studio.

The BCC Board of Trustees is the ultimate decision maker for the college. The President, Kim Krull, was in charge of day-to-day college operations and reported to the Board at monthly meetings.  Karla Fisher was Vice President of Academics under Krull.  Jay Moorman was the Dean of Fine Arts under Fisher. Valerie Haring was the "lead" Fine Arts instructor under Moorman.  Plaintiff, Roger Mathews, taught ceramics, stained glass, and jewelry classes.  He reported to Haring and Moorman.

Shortly after 6:00 a.m. on April 24, 2015, a campus Public Safety Department police officer was unlocking buildings at BCC's El Dorado campus and smelled smoke within Building 300.  He investigated and found an active fire burning in Room 324 (the Kiln room) which was assigned to Roger Mathews. Flammable paper, cardboard, and wood items had been stacked on top of a super-heated ceramic kiln and had caught fire.  Close by, there were flammable materials on top of two other kilns, which were also heated, as well as a wooden door and wooden window frames propped against or near the kilns.  In addition, an acetylene tank and at least one connected torch (used for metal art work) was left open which was allowing explosive gas to leak into the room.

The El Dorado Fire Department was called.  The police officer found a fire extinguisher and was able to extinguish the flames before they spread.  However, the burning materials continued to smolder and emit a large amount of smoke. The arriving firefighters then made sure the fire was completely extinguished and carried out debris.

The fire in Room 324 undoubtedly was caused by the one kiln.  In addition to the combustible materials on top of all of the kilns and the wooden materials in close proximity, there was a large amount of clutter throughout that classroom/studio area which could have burned.  Even more disturbing, there was the leaking acetylene gas within about ten feet of the burning materials.  Not surprisingly, the firefighters were especially disturbed regarding the extremely hazardous condition of that area.  The potential for catastrophic damage and injury had the fire gone undetected for just a few more minutes was obvious.

James "Tim" Bryan was the Chief of Police (Department of Public Safety) at BCC.  Pursuant to state law, BCC has established a campus police department whose officers have the same full law enforcement powers and authority as city police or sheriff deputies to investigate crimes on or near campus.  Chief Bryan's supervisor was Bill Rinkenbaugh, Vice President of Student Services.  Bryan went to the scene of the fire that morning and spoke to plaintiff when he arrived.  Plaintiff indicated that he had been present in his classroom/studio until about 9:30 p.m. the night before.  No one else was with him when he locked the door and left.  He also stated that he was the only person who knew how to ignite the electric kiln in question which he considered a spare.  However, Mathews could not explain how the kiln was found turned on and speculated it must have been a computer glitch.  Plaintiff denied turning it on the night before.

During the course of their conversation, plaintiff indicated to Chief Bryan that some of his kilns were used for fused glass art made by students.  At first, plaintiff

denied any ownership at all of the many fused glass items in the two (other) kilns which had also been operating all night.  However, he later let slip to Bryan that some of the items in the BCC kilns were fused glass products he had made to sell at his own personal retail art business, Mathews Gallery, located in Wichita.  He also admitted that he frequently sold art items for profit at Mathews Gallery which he had made using the BCC-owned kilns and other BCC equipment. When asked who at BCC had given him permission for that practice, Mathews replied "nobody," and that he had done it for many years.  Mathews further admitted to Bryan that he went to national art shows each year where he sold his personal art work for profit made with BCC equipment.

Because of these admissions, Chief Bryan told Mathews that Bryan was opening a criminal investigation into Mathews' use of BCC equipment and resources for Mathews' for-profit business.  That investigation included potential criminal violations for a) theft (unauthorized control over property or services pursuant to K.S.A. 21-5801), b) maintaining a public nuisance (causing or continuing a condition which endangers the public health or safety pursuant to K.S.A 21-6204), and c) interference with a law enforcement investigation (impeding or obstructing an officer's duty pursuant to K.S.A. 21-5904).  The third potential crime arose because Bryan told Mathews that morning not to contact a student witness before Bryan could talk to her, but Mathews did anyway regarding Bryan's investigation.  Chief Bryan had probable cause to believe plaintiff had

committed one or more of these crimes.  While Bryan investigated these possible criminal violations, plaintiff was not arrested or charged with any offense.

Chief Bryan's criminal investigation did <u>not</u> include the crime of arson.  The fire in Room 324 did not appear to be intentionally set.  Mathews' administrative reprimand and corrective action notice imposed by the Board of Trustees for gross carelessness was completely separate and distinct from Chief Bryan's criminal investigation of Mathews for possible theft, public nuisance, and/or interference with a police investigation.  Furthermore, Bryan could not make the decision as to whether or not plaintiff would be charged criminally for anything.  That decision would have to be made by the Butler County Attorney, who is independent of BCC and Chief Bryan.  Following Bryan's investigation, plaintiff was not charged with any crime.  Mathews was not the subject of the criminal investigation because of his age or any protected activity.

Mathews asked to meet with Chief Bryan about two months after the fire. That meeting took place on June 15, 2015, and Mathews was accompanied by his adult son who did most of the talking for his father.  The meeting was recorded by plaintiff.  In response to direct questions from the son regarding the criminal investigation, Chief Bryan was candid and factual as to the specific criminal statutes which were being considered and the sentencing grid sanctions that were possible if convictions resulted.  However, Bryan also emphasized that it would be the County Attorney's decision whether or not to prosecute any potential crime.

Bryan neither threatened nor attempted to intimidate Mathews into resigning or retiring during that meeting.

Chief Bryan did not ever state or imply that if Mathews retired from his employment, criminal charges might not be pursued.  Bryan did use the words "alternative solution" but only in the context of suggesting that Mathews should consider making restitution for the monetary losses incurred by BCC caused by his business use of the college's equipment and resources over the years.

Because of the seriousness of the fire, the fire hazards in Mathews' kiln room, and the numerous prior warnings to Mathews, the BCC president, Kim Krull (not Chief Bryan) did recommend to the BCC Board of Trustees in late June 2015 that Mathews' contract for the 2015-2016 school year be terminated.  The BCC Director of Human Resources, Vicki Long, communicated this information to Mathews both verbally on June 23 and in a letter dated June 27.  President Krull's recommendation that plaintiff's employment be terminated was completely separate and unrelated to the police investigation.

On July 14, 2015, the BCC Board of Trustees discussed the issue regarding whether Mathews' contract should be terminated.  However, the decision was postponed until the next meeting on July 27.  After discussion on that date, the Board of Trustees passed a motion directing that Mathews receive a written reprimand and that a corrective action plan be implemented because of the fire incident rather than having his contract terminated.  The Board was not advised of and did not consider Chief Bryan's criminal investigation.

Mathews did receive the written reprimand and corrective action notice dated August 14, 2015.  Mathews' salary and benefits were not reduced in any way.  He taught his art classes during the 2015 Fall semester as planned under his 2015-2016 contract.  Mathews never alleged discrimination due to age until he filed his KHRC complaint on November 5, 2015.

The corrective action plan (CAP) placed reasonable expectations on Mathews to keep his assigned area uncluttered and free of fire hazards.  Mathews' classroom/studio was not like regular classrooms on campus.  His classroom/studio contained equipment (kilns, acetylene torches, and other tools and equipment) which required strict precautions against fire hazards.  Age had no bearing on the CAP's reasonable requirements.  Moreover, the CAP was not retaliation for any protected activity.

Early in the Fall semester 2015, plaintiff asked BCC's maintenance department to perform maintenance on one of the kilns not involved in the fire.  Chief Bryan had only restricted activity with respect to the specific kiln involved in the fire because of his ongoing investigation.  Bryan did not interfere with the maintenance of plaintiff's other kilns.  Moreover, BCC purchased a new kiln for plaintiff's use that semester.

On December 15, 2015, Valerie Haring advised plaintiff that he would need to teach an Art Appreciation class during the 2016 Spring semester.  That was because plaintiff's low student enrollment had caused one of his regular classes to be cancelled.  Mathews was more than qualified to teach the Art Appreciation

class, and all other instructors in the Fine Arts Department had taught the class. On December 17, plaintiff voluntarily retired effective at the end of the year. He was not constructively discharged. No reasonable person in plaintiff's position would have felt compelled to resign or retire under those circumstances.

Mathews was never discriminated against because of his age. He also was never retaliated against for any protected activity. The bottom line is that the only adverse employment action he received in 2015 was the reprimand and corrective action plan resulting from the April fire. The CAP was well justified and had nothing to do with his age or any protected activity.

**4)      LEGAL CLAIMS AND DEFENSES.**

      **a)      Legal Claims of Plaintiff.**

Plaintiff asserts that he is entitled to recover against the defendant upon the following theories:

      1.      Age related discrimination in the nature of disparate treatment, in violation of ADEA and KADEA.

      2.      Retaliation in violation of ADEA and KADEA, for plaintiff's participation in protected activity.

      **b)      Defenses of Defendant.**

Defendant asserts the following defenses:

      1.      Defendant did not violate the ADEA, KADEA, or any other federal or state law with respect to plaintiff. He was never subjected to discrimination or retaliation because of his age.

2.      Plaintiff fails to state a viable claim for relief in whole or in part based on alleged age discrimination and/or retaliation.  Defendant had legitimate, non-discriminatory reasons for all employment actions taken with respect to plaintiff.

3.      Plaintiff cannot show even a *prima facie* case of age discrimination or retaliation.  Moreover, plaintiff cannot show that the reasons given by defendant for its actions were merely a pretext for age discrimination or retaliation.

4.      Plaintiff cannot show "but for" causation of his purported damages.  Defendant did not cause plaintiff's damages, if any.

5.      Plaintiff's damages, if any, are not of the nature or to the extent alleged.

6.      Defendant is not liable for liquidated damages because it acted at all times in good faith and with reasonable grounds for believing it was not in violation of the age discrimination laws.

7.      Plaintiff is not entitled to recovery of back pay, front pay, compensatory damages, liquidated damages, attorney fees, litigation expenses, reinstatement, court costs, or any other type of legal or equitable relief.

## 5)   DAMAGES AND NON-MONETARY RELIEF REQUESTED.

Plaintiff contends that he is entitled to recover lost pay and benefits, in the following amounts:

| | |
|---|---|
| Lost salary (to anticipated age of retirement) | $390,000 |
| Reduction in KPERS benefits due to earlier than anticipated retirement | $36,000 |

| Reduction in Social Security benefits due to earlier than anticipated retirement | $60,900 |
| Lost benefits | $46,800 |
| Legal fees and costs per 29 U.S.C. 216(b) | To be determined |
| Liquidated damages | To be determined |

**6)     AMENDMENTS TO PLEADINGS.**

None.

**7)     DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by December 14, 2018.  Discovery is incomplete, in that Karla Fisher and Mike Schweitzer are still to be deposed.  Said depositions will be completed by February 1, 2019.

Unopposed discovery may continue after the deadline for completion of discovery so long as it does not delay the briefing of or ruling on dispositive motions or other pretrial preparations.  Although discovery may be conducted beyond the deadline for completion of discovery <u>if</u> all parties are in agreement to do so, under these circumstances the court will <u>not</u> be available to resolve any disputes that arise during the course of such extended discovery.

**8)     MOTIONS.**

**a)     Pending Motions.**

None.

**b)     Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

Defendant intends to file motions for summary judgment.  If the case proceeds to trial, the parties will also file *in limine* motions.

The dispositive-motion deadline is extended to **February 4, 2019.**

The parties should follow the summary-judgment guidelines available on the court's website:

 http://www.ksd.uscourts.gov/wp-content/uploads/2015/10/summary-judgment-guidelines.pdf

Consistent with the standing order issued by Judge Melgren regarding Page Limitations for Memorandums and Briefs, the opening and response brief shall be limited to 50 pages, and the reply brief shall be limited to 30 pages, absent an order of the court.

**9)    TRIAL.**

This case will be tried by jury.  Trial is expected to take approximately four days.  This case is set for trial beginning on **October 22, 2019, at 9:00 a.m.** Unless otherwise ordered, this is not a "special" or "No. 1" trial setting.  Therefore, during the month preceding the trial docket setting, counsel should stay in contact with the trial judge's courtroom deputy to determine the day of the docket on which trial of the case actually will begin.  The trial setting may be changed only by order of the judge presiding over the trial.  The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge will convene another pretrial

conference to discuss, among other things, the setting of deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

IT IS SO ORDERED.

Dated January 4, 2019, at Topeka, Kansas.


s/ K. Gary Sebelius
K. Gary Sebelius
U. S. Magistrate Judge