# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

ROGER MATHEWS,

    *Plaintiff,*

vs.

    Case No. 17-1175-EFM

BUTLER COMMUNITY COLLEGE,

    *Defendant.*

## MEMORANDUM AND ORDER

Plaintiff Roger Mathews filed suit against Defendant Butler Community College ("BCC") alleging age discrimination and retaliation. Defendant now seeks summary judgment on Plaintiff's claims (Doc. 43). Because the Court finds that genuine issues of material fact exist, the Court denies Defendant's motion.

### I.    Factual and Procedural Background[1]

Plaintiff Roger Mathews was born in 1951. In 2015, at the time of the events at issue, he was 64 years old. Defendant BCC hired Plaintiff in October 1980, as a part-time instructor. On August 1, 1986, Defendant hired him as a full-time employee. He continued his employment with Defendant for 35 years, until December 2015.

---

[1] Only the uncontroverted facts are set forth, and they are set forth in the light most favorable to Plaintiff, the non-moving party.

He reported to Valerie Haring, the "lead" art instructor, and Jay Moorman, the Dean of the Fine Arts Department.[2] Moorman reported to Karla Fisher, the Vice President of Academics. Fisher reported to Kim Krull, the President. Krull was responsible for the day-to-day college operations, and she reported to the BCC Board of Trustees ("the Board"). The Board is the ultimate decision maker regarding employment policies and termination decisions for Defendant.

Plaintiff taught ceramics, jewelry, and stained glass. He consistently performed his duties in a satisfactory manner. Prior to August 14, 2015, he was never disciplined by Defendant, and he received favorable performance and student evaluations.

Equipment used for Plaintiff's art classes included a variety of kilns, torches, and other items. Plaintiff showed his students how to make jewelry, glass, and ceramic pieces by demonstrating the techniques used for those processes. Plaintiff made his own projects by using Defendant's kilns and torches. He purchased the materials for his own projects using his own funds. Plaintiff also purchased glass, precious metals, saw blades, and other items for students to use in class. Plaintiff sold the items that he created at his Wichita art gallery, the Mathews Gallery.

Moorman knew that Plaintiff used college-owned equipment and electricity for the items which Plaintiff sold for himself. He never made any objection. Other instructors in the department did the same thing. Moorman never told Plaintiff or any other instructor that they should stop the practice, and he is not aware of any policy of Defendant's that prohibited a faculty member from using the college's tools, equipment, or electricity for their own use.

On April 24, 2015, shortly after 6:00 a.m., there was a fire in the art lab area. Public Safety Department police officer, Kellen Morris, smelled smoke within building 300 while he was

---

[2] Haring also reported to Moorman.

unlocking buildings. He investigated and found an active fire burning in Room 324, an area with three large kilns. This room was assigned to Plaintiff for his classes. Nobody was in the room.

Flammable paper, cardboard, and wood items had been stacked on top of a heated electric kiln and had caught fire. Other combustible materials, wooden materials, and other flammable materials were nearby the electric kiln and the other two kilns. In addition, an acetylene tank and its connected torch had been left open.

The El Dorado Fire Department was called. Before they arrived, approximately six minutes after the alarm sounded, Officer Morris had already extinguished the flames. The arriving firefighters made sure the fire was completely extinguished and carried out the debris. There was some smoke damage, and the estimated loss was $100.

The fire in Room 324 was caused by the one electric kiln. On the evening preceding the fire, Plaintiff had been alone in the art lab from approximately 4:30 p.m., when classes ended, until approximately 10:30 p.m., working on making fused glass pieces. Plaintiff was using the other two kilns, but he did not use the electric kiln. The other two kilns that were being used by Plaintiff were programmed to run over several days. There was no requirement that somebody had to monitor the kilns while they completed their cycle.

The kiln that was involved in the fire was not on when Plaintiff left the art lab. If it had been on, it would have made a clicking sound. The electric kiln involved in the fire had not been used for more than a year and a half. To turn the kiln on, someone had to program the touchpad. Plaintiff stated that he was the only person who know how to ignite the electric kiln. Plaintiff denied turning it on and speculated that it must have been a computer glitch.

James "Tim" Bryan (48 years old) was the Director of Public Safety/Chief of Police of Defendant. He held several previous positions as a certified law enforcement officer. Pursuant to

Kansas statutory law, Defendant established a campus police department whose officers held the same full law enforcement powers and authority as city police or sheriff deputies to investigate crimes near campus.

Chief Bryan went to the scene of the fire after it had been extinguished. Plaintiff also came to campus shortly after being notified of the fire. Chief Bryan and Plaintiff spoke. During the conversation, Plaintiff told Chief Bryan that the two kilns that had been turned on were for fused glass art made by his students. He also told Chief Bryan that some of the items in the kilns were glass products that he had made to sell at his own personal retail art business. Plaintiff stated that he frequently sold art items for profit at Mathews Gallery that he had made using Defendant's kilns. When Chief Bryan asked Plaintiff who had given Plaintiff permission to make his own work in the kilns, Plaintiff stated "nobody," but that he had done it for years. Chief Bryan told Plaintiff that the art lab was a crime scene, and although he was not going to *Mirandize* him, Plaintiff was his number one suspect. Plaintiff stated that he felt intimidated because Chief Bryan was wearing body armor and carrying a gun.

Chief Bryan seized the glass pieces that were in the kilns not involved in the fire and told Plaintiff that they were evidence of criminal charges. Plaintiff was given an empty box and told to gather his personal possessions. An officer under Chief Bryan's supervision told Plaintiff to leave campus.

Bryan's investigation into Plaintiff after the fire included potential criminal violations for (1) theft (unauthorized control over property or services), (2) maintaining a public nuisance (causing or continuing a condition which endangers the public health or safety), and (3) interference with a law enforcement investigation. The third potential crime was because Bryan told Plaintiff not to speak to a student witness before Bryan spoke to her and Plaintiff spoke to her.

During Bryan's investigation, he discovered that Plaintiff only had one speeding ticket on his record.

Plaintiff returned to work after being gone for a week on a previously planned absence. He taught his regular art classes as usual for the remainder of the 2015 spring semester. There was no communication about the fire. At the end of the school semester, Plaintiff cleaned up his art rooms, including Room 324, to eliminate any fire hazards as required by Dean Moorman. Plaintiff cleaned up to Moorman's satisfaction.

On May 26, 2015, Moorman asked Plaintiff if he was going to retire. Plaintiff did not answer the question. According to Vicki Long, director of Defendant's Human Resources, it is not common to ask employees if they intend to retire.

On June 15, 2015, Plaintiff, with his adult son present, met with Vice President Fisher and Moorman. Fisher memorialized this meeting in an undated memorandum that was copied to Human Resources Director Vicki Long, Dean Moorman, and Chief Bryan. In this meeting, Fisher told Plaintiff that Human Resources Director Vicki Long and Chief Bryan had different views on how to proceed with Plaintiff.

Fisher stated that Long had consulted with Bob Overman (Defendant's employment lawyer), and both Long and Overman did not believe that there was a basis for Plaintiff's termination or non-renewal of Plaintiff's contract. Fisher told Plaintiff that Chief Bryan believed he had a strong criminal case against Plaintiff and that criminal charges were pending. She stated that if Plaintiff did not retire, Chief Bryan was going to move forward with prosecution. She also stated that if Plaintiff ended his employment with Defendant, Chief Bryan agreed to hold the charges "in abeyance." Fisher stated that she was not asking Plaintiff to retire but that she was simply giving him the information. Fisher also told Plaintiff that he should meet with Chief Bryan.

When Long received Fisher's memorandum, she knew that it was a violation of Defendant's policies to tell Plaintiff that if he did not retire that Defendant would have him prosecuted. In addition, Chief Bryan had never been involved in personnel decisions involving Defendant's employees, other than when he was that employee's supervisor. He had no supervisory authority over Plaintiff.

Plaintiff asked to meet with Chief Bryan after his meeting with Fisher. On June 16, 2015, Plaintiff, along with his adult son, met with Chief Bryan. The meeting was recorded by Plaintiff. Plaintiff initially asked what laws he broke. Chief Bryan told Plaintiff about three crimes that he believed Plaintiff committed and gave him a copy of the statutes and the sentencing grid. Chief Bryan told Plaintiff that he had been in law enforcement for 30 years. He stated that he reported to the county attorney and not to Defendant's employment attorney. Chief Bryan told Plaintiff that he never accused Plaintiff of committing arson but that he did tell him that the matter was initially being investigated as arson.

When Plaintiff asked what he needed to do to avoid prosecution, Chief Bryan stated that he was obligated to present the felony case to the district attorney. He stated, however, that he could make recommendations to the attorney, such as asking that the charges be "no billed" or not prosecuted. Chief Bryan stated that if an "alternative solution" was put upon him to make a recommendation to the district attorney, he would do so. Chief Bryan also stated that he had suspended the case out of courtesy to Plaintiff and in collaboration with the college. He told Plaintiff that he needed to get an attorney. Chief Bryan informed Plaintiff that if Plaintiff's attorney came forward with a legal agreement with the school and the school said that they were not interested in prosecuting that Bryan would make that recommendation.

On June 23, 2015, Plaintiff's attorney emailed a copy of the June 16 recorded meeting to Defendant's attorney. Plaintiff's attorney told Defendant's attorney that Plaintiff was in a protected age group and that it was improper to demand retirement or prosecution. Plaintiff declined to retire.

In late June 2015, Krull (Defendant's President) recommended to the Board that Plaintiff's 2015-2016 employment contract be terminated. Krull's recommendation was based on the serious nature of the fire incident. It was also based on violations that had occurred in 2002, 2004, 2007, 2008, and 2009.

The fire marshal typically visited Defendant annually. Defendant regularly received the first marshal reports on the Fine Art and Humanities building. With regard to the fire marshal reports of 2002, 2004, 2007, 2008, and 2009, Plaintiff did not receive any discipline for those reports at the time. Plaintiff was always cooperative and promptly took care of the problem. Plaintiff also did not receive any discipline for those reports between 2009 and 2015. Plaintiff did not receive any fire marshal notices between 2009 and 2015.

When the administration was gathering the fire marshal reports that concerned Plaintiff, Long became aware of other employees who had also received fire marshal writeups. She did not recommend discipline for any of the other employees. Long and Moorman were unaware of any other employees disciplined or terminated based on fire marshal reports.

Defendant has a progressive discipline policy. The policy states that an employee who has violated Defendant's policies will receive a verbal warning, a written warning, another written warning, perhaps a suspension, and then termination. The policy also states that "[e]mployment of an employee can be terminated without following the disciplinary process if it is determined that gross misconduct has occurred." When disciplinary action was being discussed in June 2015

regarding Plaintiff, there was no consideration given to imposing a type of discipline less severe than termination.

Long communicated the administrative recommendation for termination to Plaintiff both verbally on June 23, and by letter dated June 27. The recommended action could not be taken without approval of the Board. Moorman, Plaintiff's direct supervisor, was not consulted or informed in advance of the decision. He believes that it was an incorrect decision.

On July 14, 2015, the Board met in an executive session regarding whether Plaintiff's contract should be terminated. The Board expressed concern that the fire marshal reports for which part of the recommendation for termination was based, were between six and 13 years old. Moorman was unaware of any faculty or employee under his supervision terminated based on fire marshal reports. Moorman was also unaware of any employee under his supervision that was disciplined for an event that occurred six years earlier. The Board postponed its decision and requested any information about fire marshal write-ups that were more recent than 2009. No additional documentation was found.

On July 27, 2015, the administration renewed its request that the Board of Trustees authorize Plaintiff's termination. The Board rejected Krull's recommendation of termination. Instead, the Board passed a motion that Plaintiff receive a written reprimand and be placed on a corrective action plan. The Board did not provide the particulars for the plan.

Long and Moorman prepared the corrective action notice. Plaintiff received the written reprimand and corrective action plan dated August 14, 2015. The "zero tolerance" corrective action plan placed written expectations on Plaintiff to keep his assigned area uncluttered and free of fire hazards. He was also instructed to keep his classroom clutter-free. Some of the corrective action items were based on previous fire marshal writeups between 2002 and 2009. Other

corrective action items had no reference to previous writeups. For example, food and drink were not allowed to be brought into the classroom. Plaintiff was responsible for whatever occurred in the classroom, whether Plaintiff was present or not to observe the unauthorized conduct. Although the corrective action plan stated that there would be weekly monitoring, Plaintiff was required to complete a daily report certifying his compliance. No other employee who had been issued a corrective action plan was required to complete a daily checklist. Plaintiff complied with all terms of the corrective action notice.

Plaintiff did not believe that he was deserving of the written reprimand or corrective action plan. His salary and benefits were not reduced, and he taught his regular art classes in the 2015 fall semester. Moorman complained about having to monitor Plaintiff's compliance and indicated that he would have preferred for Plaintiff to be terminated.

On September 3, 2015, Plaintiff emailed Long, notifying her that Ireland Turner, the supervisor of the Maintenance Department, told Plaintiff that Turner was not allowed to work on the kilns in Plaintiff's department on orders from Chief Bryan. Long followed up on Plaintiff's complaint and checked with Turner, who verified that Chief Bryan told him that maintenance was not to perform any work in Plaintiff's area. Long forwarded the email to Krull. Chief Bryan had no supervisory authority over the Maintenance Department.

On October 23, 2015, Plaintiff filed a complaint with the Kansas Human Rights Commission ("KHRC") and the Equal Employment Opportunity Commission ("EEOC"), alleging that he had been discriminated against because of his age and had suffered unlawful retaliation. In November 2015, Moorman delayed ordering supplies for Plaintiff's jewelry classes because the request was in a handwritten format. Plaintiff had previously given handwritten supply lists, and Moorman had never told him to change that practice. Moorman directed Plaintiff to type a list of

supplies items and show the price quoted to make it easier for the administrative assistant to order the supplies.

On December 15, 2015, Haring informed Plaintiff that he would need to teach an introductory Art Appreciation class during the 2016 spring semester that would begin in January. Low enrollment numbers in Plaintiff's other classes meant that they were in danger of being canceled. Mathews had a master's degree in art and was qualified to teach the class, and all other instructors in the Fine Arts Department had taught the class. However, in Plaintiff's 35 years with Defendant, he had never taught a lecture class. The last art appreciation course he took was in the early 1970's. Plaintiff was also unfamiliar with the audio-visual equipment in the room. He felt that he was unprepared and that significant preparation time would be necessary for him to teach it effectively. He perceived the assignment as punitive.

On December 17, 2015, Plaintiff submitted his written resignation effective at the end of the year. He stated in this letter that he was being constructively discharged. Plaintiff changed it to "retirement" before he left because Long pointed out that he would be entitled to better financial benefits. Plaintiff was replaced by Tricia Coats, who was in her mid-thirties.

In May 2016, Plaintiff filed an amended KHRC/EEOC complaint alleging age discrimination, retaliation, and constructive discharge. After Plaintiff resigned, Chief Bryan was given a salary increase of more than 20 percent. His duties had not changed from the prior year. Plaintiff was not charged with any criminal offenses.

Plaintiff filed suit in 2017. He asserts claims for age discrimination and retaliation. Defendant now seeks summary judgment on Plaintiff's claims.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[3] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[4] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[5] If the movant carries its initial burden, the nonmovant may not simply rest on its pleading but must instead "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[6] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[7] The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[8]

### III. Analysis

#### A. Age Discrimination Claim

Plaintiff claims that he was discriminated against based on his age when he was constructively discharged. Under the Age Discrimination in Employment Act ("ADEA"), a plaintiff must establish "by a preponderance of the evidence, that age was the 'but-for' cause of

---

[3] Fed. R. Civ. P. 56(a).

[4] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[5] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 325 (1986)).

[6] *Id.* (citing Fed. R. Civ. P. 56(e)).

[7] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

[8] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

the challenged adverse employment action."[9]  A plaintiff need not demonstrate that age was the sole factor in the adverse employment decision but must instead demonstrate that "age was the factor that made a difference."[10]  The *McDonnell Douglas* burden shifting analysis is applicable to age discrimination claims, and the plaintiff carries the burden of persuasion throughout the three-step process.[11]  The burden of production, however, shifts at each step.[12]

> Under *McDonnell Douglas*, the plaintiff first bears the burden of establishing a prima facie case of age discrimination. If the plaintiff carries this burden, the employer must then come forward with some legitimate, non-discriminatory reason for the adverse employment action. If the employer succeeds in this showing, the burden shifts back to the plaintiff to show that the employer's proffered justification is pretextual.[13]

*1.     Prima facie case*

Generally, to establish a prima facie case of discrimination under the ADEA, a plaintiff must demonstrate that "(1) he is within the protected age group; (2) he was doing satisfactory work; (3) he was discharged; and (4) his position was filled by a younger person."[14]  A plaintiff's prima facie burden is not onerous.[15]

---

[9] *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).

[10] *Jones v. Okla. City Pub. Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010) (quoting *Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010)).

[11] *Id.* at 1278-79.

[12] *Id.* at 1278.

[13] *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008) (citation omitted).

[14] *Rivera v. City and Cty. of Denver*, 365 F.3d 912, 920 (10th Cir. 2004) (citations omitted).

[15] *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005).

In constructive discharge cases, a plaintiff may establish a prima facie case if he can show "that the defendant exposed him to intolerable working conditions."[16] "The bar is quite high in such cases: a plaintiff must show he had no other choice but to quit."[17] "The conditions of employment must be objectively intolerable; plaintiff's subjective views of the situation are irrelevant."[18] The law expects employees to tolerate merely "difficult or unpleasant" working conditions; but undesirable working conditions become legally intolerable once those conditions leave an employee that seeks relief no other reasonable choice but to quit.[19] The Court must consider the totality of the circumstances.[20]

Some circumstances illustrating legally intolerable working conditions include pervasive or severe criticism, ultimatum-like proposals to quit, work-defeating interference, and undermining an employee's work.[21] Here, viewing the evidence in the light most favorable to Plaintiff, Plaintiff was subject to these types of conditions. First, in June of 2015, he was given an ultimatum with two undesirable choices: retire (lose his job) or be prosecuted for several crimes. When he chose not to retire, he then had the threat of prosecution looming. Immediately after Plaintiff decided to not retire, Defendant's president recommended termination of Plaintiff's

---

[16] *Hooper v. Montgomery Kone, Inc.*, 60 F'App'x 732, 734 (10th Cir. 2003) (citing *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1222 (10th Cir. 2000)).

[17] *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) (citation omitted).

[18] *Coffman v. City of Leavenworth*, 303 F. Supp. 3d 1101, 1128 (D. Kan. 2018) (citations omitted).

[19] *Potts v. Davis Cty.*, 551 F.3d 1188, 1194 (10th Cir. 2009) (quotation omitted).

[20] *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 980 (10th Cir. 2008).

[21] *Steele v. City of Topeka*, 189 F. Supp. 3d 1152, 1162 (D. Kan. 2016); *see also Acrey v. Am. Sheep Indus. Ass'n*, 981 F.2d 1569, 1574-75 (10th Cir. 1992); *Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1229 (10th Cir. 2009).

employment. Although, ultimately, Defendant's board of directors rejected the termination decision, Plaintiff was placed on a zero-tolerance corrective action plan. On this corrective action plan, Plaintiff was responsible for his classroom and whatever occurred in his room, whether he was present or not. He was to keep it "clutter-free," and he was required to submit a daily report of compliance. In September, Plaintiff was denied routine maintenance on the kilns in his room because the maintenance department told Plaintiff that Chief Bryan told him not to perform maintenance in Plaintiff's area.[22] In November, Plaintiff's supervisor delayed in ordering supplies for his classroom. And finally, in December, Plaintiff was assigned to teach a class that he had neither taken nor taught for 30 years. Looking at the totality of the circumstances, Plaintiff has established a prima facie case.

### 2. *Legitimate reason*

The burden then shifts to the employer to offer a legitimate, nondiscriminatory reason for its decision. This is an "exceedingly light" burden."[23] Defendant meets its burden by stating that its decision for recommending termination and then ultimately placing Plaintiff on a corrective action plan was based on what could have been a serious fire in Plaintiff's art room and previous write-ups by the fire marshal regarding Plaintiff's classroom.

### 3. *Pretext*

Plaintiff must now demonstrate that there is a factual question as to whether Defendant's stated reason for his constructive discharge is pretext for age discrimination. "A plaintiff can show pretext by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or

---

[22] The facts are controverted as to how quickly this incident was resolved and whether students' work was affected by the denial of maintenance.

[23] *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007) (citation omitted).

contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[24] A plaintiff typically makes a showing of pretext with: (1) evidence that defendant's stated reason is false; (2) evidence that defendant acted contrary to a written policy; and (3) evidence that defendant acted contrary to an unwritten policy or practice.[25]

In this case, Plaintiff directs the Court to evidence that Defendant acted contrary to its policies. One of Defendant's employees admits that Fisher and Chief Bryan violated Defendant's policy by telling Plaintiff that unless he retired, he would be prosecuted for several crimes. It also violated Defendant's policy when Moorman asked Plaintiff when he intended to retire in late May. In addition, Defendant had a progressive discipline policy in place that was not followed when Defendant recommended Plaintiff's termination.[26] Plaintiff's corrective action plan was not only based on the fire that occurred on April 24, 2015, but also on several fire marshal write-ups from 2002 through 2009. Defendant does not provide an explanation as to why Plaintiff was not disciplined at the time of the prior fire marshal write-ups, but then included those write-ups as part of a corrective action plan. Significant to the Court's consideration is that these write-ups occurred six to 13 years prior to the 2015 fire, and Plaintiff had not received a fire marshal write-up for over six years prior to the fire. In addition, it appears that no other employees received discipline for fire marshal write-ups, no other employees were placed on "zero tolerance" corrective action plans,

---

[24] *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1315 (10th Cir. 2006) (quotation marks and citation omitted).

[25] *Kendrick v. Penske Transp. Servs, Inc*., 220 F.3d 1220, 1230 (10th Cir. 2000).

[26] The policy also had a clause that Defendant did not have to follow progressive discipline if gross misconduct occurred. Although Defendant states that the fire was of a serious nature, it does not include facts that Plaintiff engaged in gross misconduct.

and no other employees who were put on a corrective action plan were required to submit daily reports of their compliance. Finally, the corrective action plan was inconsistent in that it stated in writing that weekly compliance was required, but there was testimony that Plaintiff had to provide daily evidence of his compliance. There is no other evidence that Plaintiff, in his over thirty years of employment with BCC, had any performance issues. There were no discipline actions taken against Plaintiff for any reason until the summer of 2015, around the time Defendant's employees started inquiring as to when Plaintiff intended to retire. In sum, Plaintiff directs the Court to sufficient evidence demonstrating weaknesses and inconsistencies in Defendant's stated legitimate reason. Whether Plaintiff's work conditions were objectively intolerable, and thus was constructively discharged, is a factual question for the jury. Accordingly, the Court denies Defendant's motion for summary judgment on Plaintiff's age discrimination claim.

**B.     Retaliation Claim**

Plaintiff also brings a claim for retaliation based on his complaint that he was being discriminated against on the basis of his age. Absent direct evidence of retaliation, retaliation claims are analyzed under the *McDonnell Douglas* framework.[27] Plaintiff must first demonstrate a prima facie case of retaliation.[28] If Plaintiff does so, the burden shifts to Defendant to articulate a legitimate and nondiscriminatory reason for its decision.[29] Finally, the burden shifts back to Plaintiff to demonstrate that the employer's reason is merely pretext.[30]

---

[27] *Davis v. Unified Sch. Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014).

[28] *Estate of Bassatt v. Sch. Dist. No. 1*, 775 F.3d 1233, 1238 (10th Cir. 2014) (citation omitted).

[29] *Id.*

[30] *Id.* (citation omitted).

*1. Prima facie case*

To establish a prima facie case of retaliation, a plaintiff must demonstrate that "(1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between his protected activity and the adverse employment action."[31]

Here, protected activity occurred in mid-June 2015 when Plaintiff's attorney complained to Defendant's counsel about Defendant's retirement comments and again in October 2015 when Plaintiff filed a KHRC and EEOC complaint. Plaintiff can also establish an adverse employment action and a causal connection. "A causal connection may be shown by 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.' "[32] If an adverse action is not "very closely connected in time to the protected activity, . . . additional evidence beyond temporal proximity" is necessary.[33] Here, the adverse actions were very closely related in time. After Plaintiff made his complaint in June, Defendant almost immediately sought Plaintiff's termination. Although Plaintiff ultimately was not terminated, due to the Board's rejection of the recommendation, Plaintiff was placed on a restrictive corrective action plan within the next month. Thus, Plaintiff can establish a prima facie case.

*2. Legitimate reason*

---

[31] *Davis*, 750 F.3d at 1170 (citation omitted).

[32] *O'Neal v. Ferguson Const. Co*., 237 F.3d 1248, 1253 (10th Cir. 2001) (quotation marks and citation omitted).

[33] *EEOC v. C.R. England, Inc*., 644 F.3d 1028, 1052 (10th Cir. 2011) (quotation marks and citation omitted).

Defendant states that it sought termination and placed Plaintiff on a corrective action plan because of the potential serious nature of the fire in Plaintiff's art classroom and previous fire marshal write-ups regarding Plaintiff. Thus, Defendant meets it burden.

3. *Pretext*

As noted above when discussing Plaintiff's constructive discharge claim, there are weaknesses, inconsistencies, and contradictions in Defendant's proffered reason. Specifically, Plaintiff directed the Court to such evidence that Defendant did not follow its policies and procedures regarding the decision to seek Plaintiff's termination and in ultimately placing him on a corrective action plan. Furthermore, there is evidence that Plaintiff was subject to heightened and differing expectations on his corrective action plan than other employees. Because Defendant sought Plaintiff's termination and placed him on a restrictive corrective action plan almost immediately after Plaintiff complained that he was in a protected class, the Court finds that there is a question of fact as to whether Defendant retaliated against Plaintiff. Accordingly, the Court denies Defendant's motion for summary judgment on Plaintiff's retaliation claim.

**IT IS THEREFORE ORDERED** that Defendant Butler Community College's Motion for Summary Judgment (Doc. 43) is **DENIED.**

**IT IS SO ORDERED**.

Dated this 17th day of September, 2019.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE